SOUTHWESTERN SURETY INSURANCE COMPANY *v.* TERRY.

Opinion delivered February 21, 1916.

PRINCIPAL AND SURETY—BUILDING CONTRACTOR'S BOND—EXTRAS—RELEASE OF SURETY.—The contract of a surety on a building contractor's bond provided that alterations and additions made in the plans could be made without notice to the surety up to $15,000. Extras were allowed by the architect and owners in the sum of $14,257.97, and in addition thereto the front windows of the building were changed from straight show windows to the arcade type at a cost of $4,000 additional, and a change was made in the basement, where a cement floor was changed to a wooden one. *Held*, although these changes and additions were done at the direction and cost of the owners' lessee, that the owners consented thereto, and that these constituted alterations within the meaning of the bond, which with other extras allowed raised the extra cost in excess of the sum of $15,000, and released the surety from liability.

Appeal from Pulaski Circuit Court; *Guy Fulk*, Judge; reversed.

STATEMENT BY THE COURT.

This appeal is from a judgment against it as surety upon a contractor's bond for the erection of a six story building for appellees, the owners, upon the northwest corner of Main and Fourth streets, in the city of Little Rock.

On the 7th day of December, 1911, Adolphine Fletcher Terry and Mary Fletcher Drennan, the owners of the property, entered into a contract with the Oklahoma City Construction Company to construct a modern six story fire-proof mercantile building in two sections or units thereon.

The portion of the building to be first constructed was known as the north three bays, being about sixty feet front on Main street, which was required to be completed within 200 working days from the delivery of the premises to the contractor. The second portion, the south two bays being about forty feet front on Main street and adjoining the first portion, was to be completed within 120 days. The owners had previously entered into a contract of lease, with the Gus Blass Dry Goods Company,

and let to them for a period of years, the building they then occupied, which was on the site where the new building was to be erected and agreeing to erect a modern department store building on it and the adjacent forty feet to the south. At the time possession could not be obtained of the south forty feet occupied by the Pfeifer Clothing Company, necessitating the erection of the new building in two units, the first unit— the north sixty feet being required completed without regard to whether possession could be obtained of the ground for the building of the second.

The Oklahoma City Construction Company on the 18th day of December, 1911, executed a bond to the owners in the sum of $95,000 for the faithful performance of its contract with the appellant, the Southwestern Surety Insurance Company, as surety thereon, the condition of the bond being as follows: ''Whereas, the said, The Oklahoma City Construction Company, has on the day of the date of these presents, executed and entered into a certain contract for the erection of certain buildings in said contract described, which contract is hereto annexed;

''Now, if the said The Oklahoma City Construction Company shall well and truly perform and fulfill all and every the covenants, conditions, stipulations and agreements in said contract mentioned to be performed and fulfilled and any alterations and additions to said contract, provided such alterations and additions, if any such be made, shall not exceed in extra cost the sum of $15,000, we, the said surety, hereby expressly waiving all rights to be notified of, or by any further act to give our assent to, such alterations and additions, and acknowledging ourselves to be bound unconditionally for the faithful performance of said contract and of such alterations and additions within the limit of said contract price and of such extra cost aforesaid, and shall keep the said Adolphine Fletcher Terry and Mary Fletcher harmless and indemnified from and against all and every claim, etc. * * * then this obligation shall be void, otherwise the same shall remain in full force and virtue.''

After the contractor began work making the foundation for the north sixty feet of the building, he had to suspend because of litigation with the Pfeifer Clothing Company about possession of the site. The name of the contractor was changed to D. H. Shenk Construction Co.

The first unit or north sixty feet of the building was completed in January, 1913, and full settlement made with the contractor therefor, and for all extra work done during the month of March, 1913. Meanwhile possession had been obtained of the remainder of the site and work begun upon the construction of the second unit. In the early part of July, 1913, D. H. Shenk, the president of the construction company, contractor, was injured while engaged upon another building in the city and died on July 21. About that time the construction company suspended work on the building, being unable financially to proceed with it and the bond company was notified and requested to take charge and complete the work, which it declined to do and the owners thereupon completed same.

This suit is brought by the owners against the construction company and the bond company to recover the damages alleged to have been caused the owners by the contractor's abandonment of the work and failure to complete the contract and pay off and discharge the claims for liens asserted against the building. The contractor did not answer, but the bond company answered denying that the contractor had abandoned the work before completion; that the owners made demand upon it to complete the building and that it had refused to do so and alleged it was discharged from liability as surety because the parties had changed the contract without notice to it from the construction of a six story building as contracted for and erected a seven story building instead; second, that substantial alterations were made in the work, changing the original contract in a material manner without a written order of the architect; third, because the Gus Blass Dry Goods Company without the surety's knowledge or assent was made a party to the

contract; fourth, because the owners had paid the contractor more than 85 per cent of the value of the work as it progressed and did not retain the 15 per cent as required by the terms of the contract until the final completion of the work and; fifth, because the alterations and additions had been made to the original contract which were largely in excess in extra cost of the sum of $15,000 and the same were made without notice to the surety and without its consent.

It was not disputed that the contractor abandoned the work before the completion of the building, that the owners made demand upon the bond company to finish the building which it refused to do and thereupon the owners took possession and completed it and it was virtually undisputed that the contractor was not financially able to proceed with the work at the time of its abandonment. A vast amount of evidence was taken as to the kind, character, amount and value of extra work performed by the contractor and whether such work amounted to alterations and additions to the principal contract or was independent and additional thereto, and not contemplated by its terms, also as to whether certain work was solely for the benefit and convenience of the Gus Blass Dry Goods Co., the lessee and not included within alterations and additions to the building contract.

The bond company contended that all items of extra work were such in character as under the terms of the building contract and its bond, amounted to alterations and additions to the contract.

The owners contended that less than $15,000 of the extra work was of such character.

The evidence as to the correct classification of the extra work done by the contractor was conflicting as to many items. The original contract price of the building was $136,355 and the owners had paid the contractor to the time of Mr. Shenk's death and the abandonment of the work, $148,552.73, and had retained under the terms of the contract $6,705.30, making a total for the building

of $155,258.03, showing a balance of $18,903.03, paid the construction company over and above the original contract price.

The testimony also shows that the Gus Blass Dry Goods Co., lessee of the building, took possession before it was completed, directed a number of changes to be made by the contractor, independent of the owners, but with their assent, that other changes were made in the original plans under an agreement with the owners, whereby the Blass Company and the owners were to pay jointly the expense of the change; the Blass Company was charged with about $9,000 for extra work.

It is admitted that the architect allowed certain items of the account of the contractor for extras as being alterations and additions to the building contract amounting to the sum of $14,257.97, which included the raise of the height of the attic on the sixth floor to a seventh story. He allowed also of the extras claimed against the owners, certain other items in the sum of $5,046.87, classed as additional or separate contracts with the owners and allowance to compensate the contractor for time lost, etc., that did not involve any alterations or change in the building contract. He allowed the claim of the contractor for certain other extras against the Gus Blass Dry Goods Co. in the amount of $8,635.30.

Testimony was taken upon each item of the claim for extras.

In the construction of the building on the first floor, a change was made from plate glass show windows upon the property line on the front or Main street side to an arcade or tiled floor passage, with plate glass walls across the front, making in effect a double or box show window with plate glass on the street side and plate glass on the side next to the passage way and plate glass show windows on the other side of the passage way, the front of the store rooms, at an additional cost of more than $4,000.

The contract required and the specifications provided for a cement basement floor of one inch thickness of Portland Cement and sand in proportion, on top of a five

inch thickness of composition of Portland Cement, coarse sand and crushed stone, which was changed to pine lumber on a three inch base of composition in the construction, at an extra cost of more than $2,000. These changes were made with the assent of the owners at the suggestion of the lessee, Gus Blass Dry Gooods Company, which agreed to pay therefor.

Other facts will be stated in the opinion.

*Jno T. Suggs* and *J. W. & J. W. House, Jr.,* for appellant.

The material alterations and changes in the contract, without the surety's consent (in excess of the $15,000 permitted) absolutely discharged the surety in this case. The alterations were not independent and additional contracts within the meaning of the rule in 112 Ark. 207. 65 Ark. 552; 66 *Id.* 288; 71 *Id.* 200; 74 *Id.* 601; 2 Brandt, Suretyship, § § 278, 288; 24 A. & E. Enc. Law, 837; 37 Mo. App. 466; 22 Ind. 388; 36 Minn. 439; 10 Ga. 235; 46 N. W. 1018; 52 *Id.* 1104; 99 Fed. 237; 54 S. W. 303; 13 Ind. 286; 99 Pac. 857; 85 Ark. 451; 27 A. & E. Enc. L. 499; 99 Ark. 112; 101 *Id* 22; 104 *Id.* 573; 106 Mass. 532; 27 N. J. L. 131; 125 N. Y. Sup. 867; 100 N. W. 780; 111 Ark. 373; 67 Pac. 989.

*W. L. & D. D. Terry* and *Moore, Smith, Moore & Trieber,* for appellees.

None of the changes were alterations within the meaning of the contract, but were in effect independent and additional contracts and were not a change of the terms of the contract so as to release the surety. The cost of the extra work should not be counted so as to increase the cost above $15,000, as provided for in the original contract. 22 S. W. 622: 77 S. W. 329; 89 Mo. App. 204; 65 Tex. 259; 24 Atl. 1068; 174 S. W. 206; 112 Ark. 207; 33 N. E. 550.

Both sides argue other questions not decided by the court.

KIRBY, J., (after stating the facts). In *Snodgrass v. Shader,* 113 Ark. 429, the law relating to the discharge of

a surety on account of material alterations in the terms of the contract made without his consent, was declared as follows: "The courts have long held that any material alteration in the terms of a contract, whereby a surety is bound, discharges the surety as he has not consented to the change, and this is so, even if the alteration be for the benefit of the surety; for, although the principals may change their contract to suit their pleasure or convenience, they can not bind the surety thereto, without his consent, and, as the new contract abrogates the old, the surety is discharged from all liability unless he has consented to the alteration. *O'Neal* v. *Kelley,* 65 Ark. 550; *Singer Mfg. Co.* v. *Boyette,* 74 Ark. 601; 1 Brandt on Suretyship, section 427; *Hubbard* v. *Reilly,* 98 N. E. 886; *Warren* v. *Lyons,* 9 L. R. A. 353; *Stern* v. *Sawyer,* 61 Atl. 36; *Miller* v. *Stewart,* 9 Wheaton, 702; *Penn* v. *Collins,* 5 Rob. (La.) 213.

In *Berman* v. *Shelby,* 93 Ark. 479, the court said: "For a surety will be discharged by any material and unauthorized alteration of his contract, and it is immaterial that the principal assured the obligee that the alteration would not affect the original contract, or that he failed to carry out the contract as altered."

The bond of the surety herein permitted any alterations and additions to the contract not exceeding in extra cost the sum of $15,000, and, of course, the surety would be bound to the performance of it so long as the alterations and changes made did not exceed said sum, having consented in advance thereto.

It is conceded that alterations and changes within the meaning of the contract were made in the said sum of $14,257.97, allowed by the architect and owners for extras. It is contended by appellant that the construction of the arcade in the front of the first floor of the building instead of the straight show windows and of the wooden floor in the basement instead of the cement, as provided in the contract, were alterations within the meaning of the surety's bond and increased the extra cost of alterations beyond the said sum of $15,000 consented to and released it from

liability thereon. Unquestionably the arcade and the wooden basement floor were not provided for, nor contemplated in the making of the contract and undeniably were both constructed by the contractor in the erection of the building at the extra cost specified, and although the change was made at the instance of the lessee, who agreed to pay the extra cost thereof, it was done with the assent of the owner, and if it was an alteration within the meaning of the bond, which, with the others, raised the extra cost in excess of the said sum of $15,000, released the surety.

The appellees insist that neither constituted an alteration within the meaning of the contract, but in effect that both were constructed under independent and additional contracts within the doctrine announced by many cases of other jurisdictions cited, and our own case of *Hinton* v. *Stanton*, 112 Ark. 207. In this case, the court said: "The test of materiality of the change is this, 'Could the owner have made a separate contract for the *porte cochere* and could that contract have been performed without changing the contract which Norris had made, and upon which appellee was surety? If this could have been done, then the contract for the *porte cochere* is an additional contract and not a change in the original contract.' "

In *Fullerton Lumber Co.* v. *Gates*, 89 Mo. Appeals 204, the court said: "Without pretending to submit a rule applicable to all cases, we will say that where the different matter does not consist of a change of that provided for or contemplated by the contract, but is something additional, and not included in the contract, then it is an independent transaction."

The undisputed testimony shows that the arcade could not be constructed independently by another contractor during the progress of the work of construction of the building, nor the building completed without the construction either of the straight show windows specified or the substituted arcade consented to, and also that the putting in of the wood or plank floor instead of cement, in the basement, was a change or alteration of the

floor construction required by the contract, and although it was shown the wooden floor could have been constructed by another contractor after the cement floor was finished in accordance with the specifications, it could not have been done without tearing up and reconstructing the floor, and the contract called for a floor constructed in the basement by the contractor, and could not have been performed without the construction of the floor required by the specifications or one of some other kind agreed upon. The change from cement to wood was necessarily, therefore, an alteration within the meaning of the contract permitting alterations not to exceed in cost the sum of $15,000, as was likewise the building of the show windows in arcade style rather than with straight front effect. *Neuwirth* v. *Moydell,* 174 S. W. (Mo. Ap.) 207.

In the court's view of the case as already expressed, it becomes unnecessary to determine the several other questions raised. Said material alterations not having been consented to by the surety, discharged it, and the judgment is accordingly reversed and the cause dismissed.